Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/10/2018 09:08 AM CDT

State of Nebraska, appellee, v.
Anthony L. Swindle, appellant.
___ N.W.2d ___

Filed August 10, 2018.    No. S-17-761.

1. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.
2. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
4. **Judges: Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.
5. ____: ____: ____. An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the sufficiency of a party's foundation for admitting evidence.
6. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
7. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.
8. **Jury Instructions: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

9. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

10. **Jury Instructions.** In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.

11. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

12. **Statutes: Legislature: Intent.** In determining the meaning of statutory language, its ordinary and grammatical construction is to be followed, unless an intent appears to the contrary or unless, by following such construction, the intended effect of the provisions would apparently be impaired.

13. **Sexual Misconduct: Evidence: Proof.** Subject to several exceptions, Neb. Rev. Stat. § 27-412(1) (Reissue 2016) bars evidence offered to prove that any victim engaged in other sexual behavior and evidence offered to prove any victim's sexual predisposition in civil or criminal proceedings involving alleged sexual misconduct.

14. **Sexual Assault: Evidence.** The rape shield statute is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters.

15. **Sexual Assault: Trial: Witnesses.** In limited circumstances, a defendant's right to confrontation can require the admission of evidence that would be inadmissible under the rape shield statute.

16. **Constitutional Law: Trial: Juries: Witnesses.** An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.

17. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

18. **Courts: Motions for Mistrial.** A trial court is vested with considerable discretion in passing on a motion for mistrial in order to more nearly effectuate the ends of justice.

19. **Trial: Prosecuting Attorneys.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

20. \_\_\_\_: \_\_\_\_. A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

21. **Trial: Prosecuting Attorneys: Jury Instructions: Appeal and Error.** Not every variance between a prosecutor's advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given and the remarks are not crucial to the State's case.

22. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

23. **Trial: Appeal and Error.** On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial.

24. **Trial: Evidence: Appeal and Error.** Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.

25. **Rules of Evidence: Hearsay.** It is a fundamental rule of evidence that a statement is not hearsay if it is offered against a party and is the party's own statement.

26. **Trial: Hearsay.** Where the reason for a trial court's overruling of a hearsay objection is left at large, arguably, it is the opponent's burden to demand an explanatory ruling.

27. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

28. **Trial: Witnesses: Hearsay.** A witness who hears an oral admission by a party may testify as to that admission.

29. **Sentences: Appeal and Error.** An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result.

Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed.

James J. Regan for appellant.

Douglas J. Peterson, Attorney General, and Glen Th. Parks for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Funke, J.

Anthony L. Swindle was convicted by a jury of two counts of sexual assault of a child in the first degree, one count of sex trafficking of a victim under 16 years of age, and one count of sex trafficking by inflicting or threatening serious personal injury. The district court for Douglas County sentenced Swindle to consecutive terms totaling between 180 years' to life imprisonment, and Swindle filed this appeal. We affirm.

## I. BACKGROUND

Swindle was the "pimp" of Lisa Villanova-White. Swindle and Villanova-White used the website "backpage.com" to receive calls and texts to perform sex acts for money. Villanova-White testified she had the telephone numbers of 406 men saved in her cell phone. The soliciting included both "incalls," where the client or "john" arrived at Villanova-White's house in Omaha, Nebraska, and "outcalls" at hotel rooms or casinos. Villanova-White estimated that Swindle drove her to 50 outcalls to anywhere from Omaha to Norfolk, Nebraska, to Woodbine, Iowa. She testified about an outcall at a motel in Fremont, Nebraska. The client refused to pay for the full hour, so Swindle went up to the room, "knocked him out," and took his money.

Swindle's involvement in Villanova-White's online prostitution business expanded over time. At first, Villanova-White thought that Swindle was her business partner and that she was just loaning him money, but he soon began to take and keep half or more of her money from clients. He had a key to her house and would take money from her purse or money that she kept hidden in books or clothes. Villanova-White said Swindle threatened her indirectly by constantly mentioning that he had physically harmed people, sometimes with the use of guns. Swindle once joked while Villanova-White was in his

car about killing someone, and he showed her a handgun he kept hidden underneath his seat.

Within the first few months, Swindle asked Villanova-White to be a "madam" and started bringing other women to her house, including a homeless woman, A.R., age 21.

### 1. A.R.

A.R. had a long history of physical and sexual abuse. She was abused by her stepfather from ages 6 to 12, until she left her home and went under the care of Lutheran Family Services. At age 18, A.R.'s mother, in exchange for payment, took her to a party and left her there to be gang raped by 10 men. During that same time period, A.R. had a boyfriend who was convicted for abusing her after she testified against him.

Swindle met A.R. in March 2015 when he drove up to her while she was walking down a North Omaha street. A.R. testified that she and Swindle began dating. A.R. had been living with her mother and grandmother, but when her mother moved, A.R. was not welcome to go with them and found herself homeless. Swindle told her that she could stay at his friend's house, but that she would need to have sex with clients to pay for rent. Swindle first brought A.R. to his "brother's" house so that she would have sex in exchange for money that he had already been paid. He then brought A.R. to Villanova-White's house and had Villanova-White set up an online account for her. Villanova-White took photographs of A.R. wearing Villanova-White's lingerie and posted them online.

Swindle told A.R. about the house "rules." He provided her with condoms and marijuana, and instructed her to leave money from clients on the edge of the dresser so that when she walked them out, Swindle would take the money.

Swindle instructed Villanova-White that A.R. was never allowed to leave without his knowledge and to report to him if A.R. left, because "she's not gonna give [sex] away for free." Villanova-White used an alarm system in the house and did not give A.R. the code. The alarm signaled when there was activity downstairs and at the front door.

A.R. stayed at the house for the next 2 to 3 months and had sex with clients from the online website, but was never given any of the money. During her stay, Swindle impregnated A.R. and she had a miscarriage while with a client. On one occasion, Swindle drove A.R. to an "outcall" in Omaha, where the client refused to pay and stabbed A.R. in the wrist. She contacted the 911 emergency dispatch service and went to the hospital. Law enforcement officials suspected that A.R. was involved in prostitution, but did not intervene because she was unwilling to provide information.

A.R. testified that on the first day at the house, she told Swindle that she did not want to be a prostitute. Swindle told her to "just get it over and done with." A.R. testified that she repeated to Swindle that she did not want to be a prostitute many times thereafter. She testified she had never engaged in prostitution before, but that she stayed with Swindle because she had feelings for him, felt intimidated by him, and felt she had no choice but to stay. A.R. knew that Swindle kept a handgun underneath his driver's seat, and he told her that he had used the handgun to kill someone. On one occasion, A.R. tried to keep $42 she received from a client to pay her cell phone bill. Swindle demanded the money, and when she refused, he choked her using both his hands.

A.R. later saved $200 to "try to get away." She messaged a friend on social media to come and pick her up. When she got into her friend's car, she realized she had forgotten her cell phone and went to retrieve it from the house. By then, Villanova-White had informed Swindle that A.R. was leaving with money. Swindle was waiting for A.R. at the front door. He said, "bitch, I told you not to leave," and "[p]unched her in the face"; she fell to the ground on the front lawn, and he then took the money.

In July 2015, Villanova-White was evicted from her home. She moved to a hotel in Omaha, and Swindle ensured that she took A.R. with her. The day of the move, A.R. convinced her mother to pick her up at the hotel and she escaped.

2. M.M.

Swindle met the minor victim, M.M., between 4 and 5 a.m. on September 15, 2015, when she was walking alone down the street after she had run away from home. M.M. had been diagnosed with schizoaffective disorder and disruptive mood dysregulation disorder. She was assessed to be low functioning and needed assistance with all aspects of daily living.

Swindle pulled up next to her and asked her if she wanted to earn some money. She said "sure" and got into his car, and he drove to an empty street and pulled over. He asked her to take off her shirt, and she said no. Swindle yelled at her, "I told you[,] you have to do what I say." He then took off her shirt, had her remove her pants, and had sexual intercourse with her.

Swindle then called Villanova-White while in the car and said, "I have another girl to help you pay for the hotel." He took M.M. to the hotel and had Villanova-White advertise M.M. online. M.M. performed sex acts with men for money over the course of a few days. In the early morning hours between September 15 and 16, 2015, while Villanova-White was out, Swindle confronted M.M. in the hotel room and forced her to have sexual intercourse with him a second time. M.M. testified that she tried to get away but that Swindle held her down with "one hand on my chest and the other on my arm, so I couldn't, like, flail."

On September 18, 2015, a police officer determined that M.M.'s photograph from an online escort advertisement matched a missing person's report of a 15-year-old. Law enforcement acted immediately; M.M. was removed from the hotel, and Swindle and Villanova-White were subsequently arrested. Villanova-White entered into a proffer agreement to testify, without any promises of leniency. At the time of trial, she faced charges of pandering, with a possible penalty of between 1 and 50 years' imprisonment.

### 3. Trial and Sentences

After a 7-day trial, the jury found Swindle guilty on counts 1 and 2: sexual assault of a child in the first degree, in violation of Neb. Rev. Stat. §§ 28-319.01(1)(b) and (2) (Reissue 2016), each a Class IB felony; count 3: sex trafficking of a victim under 16 years of age, in violation of Neb. Rev. Stat. § 28-831(1) (Reissue 2016), a Class II felony; and count 4: sex trafficking by inflicting or threatening serious personal injury, in violation of § 28-831(2), a Class IIA felony. The district court determined Swindle was a habitual criminal and sentenced him to consecutive sentences of imprisonment of between 60 years to life on count 1, between 60 years to life on count 2, between 40 to 60 years on count 3, and between 20 to 60 years on count 4.

Swindle appeals.

## II. ASSIGNMENTS OF ERROR

Swindle assigns, restated, that the district court erred by (1) failing to instruct the jury that a defendant's knowledge of the victim's age is an essential element of the offense of sex trafficking of a minor, (2) refusing to allow Swindle to question the minor victim about her history of making false claims of rape when she got in trouble for running away, (3) admitting statements made by the defendant without adequate foundation, (4) refusing to grant a mistrial based upon claims of prosecutorial misconduct, and (5) imposing excessive sentences.

## III. STANDARD OF REVIEW

[1] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[1]

---

[1] *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

[2] Whether to grant a mistrial is within the trial court's discretion, and we will not disturb its ruling unless the court abused its discretion.[2]

[3-5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[3] The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.[4] We review for abuse of discretion a trial court's evidentiary rulings on the sufficiency of a party's foundation for admitting evidence.[5]

[6] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[6]

## IV. ANALYSIS

### 1. Court Did Not Err
### in Instructing Jury

Swindle argues that the district court erred when it refused his proposed jury instruction. He contends that a defendant's knowledge of the victim's age is an essential element of the offense of sex trafficking of a minor. At the jury instruction conference, Swindle offered the following proposed instruction, which he fashioned from NJI2d Civ. 7.62, Negligent Entrustment:

---

[2] *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014); *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

[3] *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018). See *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999).

[4] *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012); *State v. Ford*, 279 Neb. 453, 778 N.W.2d 473 (2010).

[5] See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[6] See *State v. Brown, ante* p. 57, 912 N.W.2d 241 (2018).

In your deliberations with regard to Count III of the Information/Amended Information, in order for you to determine that [Swindle] is guilty of Trafficking of a person who has not attained the age of 16 years, you must find that [Swindle] *knew or should have known* that the victim i[n] question had not attained the age of 16 years.

(Emphasis supplied.)

The court refused the proposed instruction and gave an instruction which recited the elements of the offense as (1) that on the relevant dates the defendant engaged in sex trafficking of a minor and (2) that at that time, M.M. was less than 16 years of age. The court provided a definitional instruction which stated:

"Sex trafficking of a minor" means knowingly recruiting, enticing, harboring, transporting, providing, or obtaining by any means or knowingly attempting to recruit, entice, harbor, transport, provide, or obtain by any means a minor for the purpose of having such minor engage in commercial sexual activity, sexually explicit performance, or the production of pornography or to cause or attempt to cause a minor to engage in commercial sexual activity, sexually explicit performance, or the production of pornography.[7]

Swindle argues the statutory definition of sex trafficking of a minor supports his proposed instruction, because the definition contains the word "knowingly." Swindle contends that "knowingly" commonly requires a defendant's perception of facts which make up the crime. Swindle claims the prosecution failed to prove that he knew M.M. was 15 years old, because M.M. admitted that she lied about her age and told Swindle that she was 20 years old.

Swindle claims that he received a greater sentence as a result of the court's denial of his proposed instruction. Putting

---

[7] See Neb. Rev. Stat. § 28-830(14) (Reissue 2016) (now found at § 28-830(12) (Supp. 2017)).

aside Swindle's habitual criminal status, sex trafficking of a minor is a Class IB felony,[8] with a minimum penalty of 20 years' imprisonment and a maximum of life imprisonment; whereas sex trafficking of an adult is a Class II felony,[9] with a minimum penalty of 1 year's imprisonment and a maximum of 50 years' imprisonment.[10]

[7,8] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[11] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[12]

[9] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[13] We conclude that the court did not err in refusing Swindle's proposed instruction.

[10] In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.[14] Although the law does not require that a jury instruction track the exact language of the statute,[15] using the specific language of a statute is an effective means of implementing the intent of

---

[8] See § 28-831(1).

[9] See § 28-831(2).

[10] See Neb. Rev. Stat. § 28-105(1) (Supp. 2017).

[11] *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

[12] *Id.*

[13] *Id.*

[14] *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016); *State v. Armagost*, 291 Neb. 117, 864 N.W.2d 417 (2015).

[15] *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015).

the Legislature.[16] This practice provides the added benefits of easing the process of preparing jury instructions and creating certainty for trial courts that the jury has been provided the essential elements of an offense.[17]

[11] Swindle's proposed instruction, borrowed from the civil context of negligent entrustment of a motor vehicle, assumes conduct, liability, and consequences distinct from the charged offense of sex trafficking of a minor, and therefore cannot be a correct statement of the law in this case. To provide one example, the instruction introduces the mens rea element of "should have known," which is absent from the statutory definition of sex trafficking of a minor. For that reason alone, Swindle's instruction goes beyond the plain reading of the statute. It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[18]

We agree with the State that the better analogy is the crime of sex trafficking of an adult. The Legislature used identical language to define the crimes of sex trafficking of a minor and sex trafficking of an adult, except sex trafficking of a minor applies to victims under the age of 18.[19] If Swindle's argument is accepted, then by parity of reasoning, the State would be unable to sustain a conviction of sex trafficking of an adult unless it proved that a defendant knew that the victim was 18 years of age or older. We agree with the State that this is an absurd result. Instead, the natural reading of these offenses is that the victim's age is intended to classify sex trafficking of a minor as a more serious offense and that the victim's age does not relate to the defendant's mens rea. This reasoning is further strengthened by the Legislature's decision to increase the penalty for sex trafficking of a minor who is under 16 years

---

[16] *Armagost, supra* note 14.

[17] See *id.*

[18] *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

[19] See § 28-830(10), (13), and (14).

of age.[20] The plain language of the criminal statutes supports this conclusion.

[12] In determining the meaning of statutory language, its ordinary and grammatical construction is to be followed, unless an intent appears to the contrary or unless, by following such construction, the intended effect of the provisions would apparently be impaired.[21] The language of § 28-830(14), as it existed at the time of the offense, does not define the word knowingly. However, it is clear that "'knowingly' . . . is an adverb, and common usage makes clear that an adverb modifies the verbs that come after it," and not the noun "a minor" that follows.[22] Under this interpretation, the prosecution was required to prove that Swindle knew that he recruited, enticed, harbored, transported, or provided a minor for the purpose of sex trafficking, or knew that he attempted to do so. Thus, even if we accept Swindle's argument that there was no evidence that he knew M.M.'s age, an ordinary reading of § 28-830(14) shows that the term "knowingly" requires only that a defendant had knowledge that he or she engaged in conduct for the purpose of sex trafficking and does not require a defendant to have knowledge that the victim was a minor. Dispensing with the knowledge requirement is appropriate where the underlying conduct is illegal, irrespective of a defendant's knowledge of the victim's age.[23]

Yet, another analogy is to the crime of first degree sexual assault of a child.[24] Under § 28-319.01(1), a person commits sexual assault of a child (a) when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older or (b) when the victim

[20] See § 28-831.

[21] *Placek v. Edstrom*, 148 Neb. 79, 26 N.W.2d 489 (1947); *Nebraska State Railway Commission v. Alfalfa Butter Co.*, 104 Neb. 797, 178 N.W. 766 (1920).

[22] See *State v. Sims*, 195 So. 3d 441, 446 (La. 2016).

[23] See *Sims, supra* note 22.

[24] See § 28-319.01.

is at least 12 years of age but less than 16 years of age and the actor is 25 years of age or older. In regard to the age of the victim, our case law provides that reasonable mistake as to the age of the victim is not a defense.[25]

When the Legislature has intended to make age an essential element of the offense of sexual assault upon a child, it has used plain language.[26] Section 28-319.01(4) states that "[i]n any prosecution under this section, the age of the actor shall be an essential element of the offense that must be proved beyond a reasonable doubt." Indeed, following Swindle's trial, the Legislature used plain language when it codified the rule that "[i]t is not a defense in a prosecution [of the offense of sex trafficking of a minor] that the defendant believed that the minor victim was an adult."[27]

Similarly, in construing the Mann Act, 18 U.S.C. § 2421 et seq. (2012 & Supp. IV 2016), federal courts have considered and rejected the claim that knowledge of the age of the victim is an element of sex trafficking of a minor.[28] "It would be nonsensical to require proof of knowledge of the victim's age when the statute exists to provide special protection for all minors, including, if not especially, those who could too easily be mistaken for adults."[29]

The trial court correctly instructed the jury that to obtain a conviction under § 28-831(1), the prosecution needed to prove

---

[25] See, *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991); *State v. Navarrete*, 221 Neb. 171, 376 N.W.2d 8 (1985).

[26] See § 28-319.01(4).

[27] See 2017 Neb. Laws, L.B. 289, § 9 (codified at § 28-831(4)(c) (Supp. 2017)).

[28] See, *U.S. v. Cox*, 577 F.3d 833 (7th Cir. 2009); *U.S. v. Jones*, 471 F.3d 535 (4th Cir. 2006); *U.S. v. Griffith*, 284 F.3d 338 (2d Cir. 2002); *U.S. v. Taylor*, 239 F.3d 994 (9th Cir. 2001); *United States v. Hamilton*, 456 F.2d 171 (3d Cir. 1972).

[29] *Jones, supra* note 28, 471 F.3d at 540.

only that Swindle engaged in sex trafficking of M.M. and that at the time, M.M. was less than 16 years of age. Swindle's proposed instruction was an incorrect statement of the law, and the court appropriately gave an instruction which used statutory language to define the offense. Swindle was not prejudiced by the court's refusal of his instruction. Swindle's first assignment of error is without merit.

## 2. Court Did Not Err in Determining Swindle's Line of Questioning of M.M. Was Impermissible

Swindle argues the district court erred in refusing to allow him to question M.M. about her history of making false claims of rape. Swindle argues his questioning went to M.M.'s credibility and was not precluded by Nebraska's rape shield statute, Neb. Rev. Stat. § 27-412 (Reissue 2016), and that the district court's ruling violated Swindle's right to confront his accuser.

### (a) Additional Background

Prior to trial, Swindle filed a notice of intent to present § 27-412 evidence. He sought to adduce evidence that M.M. had on multiple prior occasions run away from home and, when caught, falsely claimed that she had been raped. At a hearing on the issue, Swindle's counsel made an offer of proof that, if called to testify, M.M.'s mother would testify that she told healthcare providers that M.M. "is hypersexual and seeks out sexual behaviors with older men." Swindle's counsel stated M.M.'s mother would testify that on multiple occasions, M.M. has run away, lied about her age, had intercourse, and then stated that it was rape and "yell out for help." Swindle said the mother would state this is part of M.M.'s mental illness.

The court entered a pretrial order which stated:

> [T]his Court may allow [Swindle] to question M.M. about prior false assertions of rape. The Court, however, will not allow [Swindle] to venture into M.M.'s sexual history. . . .

. . . .

[Swindle's] own Motion concedes that the evidence he hopes to elicit "is relevant to a determination of the credibility of [M.M.]." [Swindle] may not undermine M.M.'s credibility by drudging up her sexual behavior or sexual predisposition.

At trial, the following exchange took place during direct examination of M.M. by the prosecution:

Q And how old did you tell [Swindle] you were?

A Twenty.

Q Okay. Was that true?

A No.

Q Okay. And why did you give him — why did you say you were 20 as opposed to 15?

A Because when I usually ran away, I would have an older male take me somewhere or back to their [sic] place.

During cross-examination, Swindle's counsel asked M.M. what she meant by her answer. The prosecution objected based on relevance and § 27-412. At a sidebar, Swindle's counsel stated that he intended to establish that M.M. had run away on multiple occasions and that he would end the line of questioning at that point. The court ruled that it would permit Swindle's counsel to ask M.M. about lying about her age, but found that testimony about running away was not relevant. Cross-examination of M.M. continued, and Swindle's counsel asked the following questions, and M.M. gave the following answers:

Q So it was getting caught for running away that got you into the frame of mind that you had to blow it out of proportion?

A Yes.

Q You'd been in that situation before on multiple occasions; right?

A Yes.

Q And on those occasions have you responded by telling people that you've been raped?

The prosecution objected based on § 27-412 and relevance, and argued that there was no evidence that M.M. had falsified claims of rape. The court asked for an offer of proof from Swindle's counsel. Receiving no offer of proof at that time, the court sustained the prosecution's relevance objection.

The following morning of trial, Swindle's counsel moved for a mistrial and argued that he intended to question M.M. about prior false allegations of rape that she made following running away. Swindle's counsel stated:

> [M]y proffer and offer of proof was that [M.M] will admit, if I would have been allowed to question her, that she had run away on multiple prior occasions — and I would not have inquired with regard to her promiscuity or sexual activity during those runaways, but that she then, upon being taken back into custody following the runaway, saw medical providers or saw — talked to other people in a therapeutic setting and basically admitted that she falsified her claims of being raped when — after she ran away and got caught.

Swindle's counsel offered a portion of M.M.'s medical records. The records provide a background of events leading up to a suicide attempt by M.M following her assault by Swindle. The records include statements from M.M.'s mother, consistent with Swindle's pretrial proffer, that M.M. had run away multiple times in the past year and that each time, M.M. sought out sex with older men. Her mother stated that in each instance, M.M. lied about her age, had sex, and later claimed that it was rape.

Swindle's counsel claimed that based on the court's pretrial ruling, he anticipated he would be able to ask M.M. about these events. He claimed that had he known he would not be permitted to pursue this line of questioning, he would have called M.M.'s mother as a witness. He argues the court's refusal to allow cross-examination of M.M. regarding her credibility denied Swindle his right to a fair trial.

(b) Disposition

We consider the application of § 27-412 to the facts of this case and whether the questions posed to M.M. were so relevant that Swindle's right of confrontation required the admission of M.M.'s testimony regarding her prior false claims of rape. We note that while Swindle's brief included separate assignments of error regarding these two issues, he consolidated them into a single argument and, thus, we discuss the issues together.

[13] Subject to several exceptions, § 27-412(1) bars "[e]vidence offered to prove that any victim engaged in other sexual behavior" and "[e]vidence offered to prove any victim's sexual predisposition" in civil or criminal proceedings involving alleged sexual misconduct.[30]

[14] Nebraska's rape shield statute serves two purposes. First, the statute protects rape victims from grueling cross-examination about their past sexual behavior or sexual predisposition that too often yields testimony of questionable relevance.[31] Second, the rape shield statute prevents the use of evidence of the complaining witness' past sexual conduct with third parties or sexual predisposition from which to infer consent or undermine the witness' credibility.[32] The rape shield statute is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters.[33]

Section 27-412 is subject to three enumerated exceptions, generally stated: (1) evidence offered to prove a person other than the accused was the source of physical evidence;

---

[30] § 27-412(a) and (b).

[31] *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014), *disapproved in part* 292 Neb. 424, 873 N.W.2d 155 (2016); *Lessley, supra* note 3.

[32] *Lavalleur, supra* note 31; *State v. Sanchez-Lahora*, 261 Neb. 192, 622 N.W.2d 612 (2001).

[33] *Lavalleur, supra* note 31.

(2) evidence relevant to the issue of consent; and (3) evidence which, if excluded, would violate the accused's constitutional rights.[34] Swindle's stated purpose of the cross-examination was not to show another source of physical evidence or that M.M. consented to sex with Swindle. Rather, Swindle contends that evidence of M.M.'s prior false claims of rape went to M.M.'s credibility.

Although there is no Nebraska case directly on point, we agree with the majority of jurisdictions which hold that a false accusation of rape where no sexual activity is involved, is itself not "sexual behavior" involving the victim, and that such statements fall outside of the rape shield law.[35] However, before defense counsel launches into cross-examination about false allegations of sexual assault, a defendant must establish, outside of the presence of the jury, by a greater weight of the evidence, that (1) the accusation or accusations were in fact made, (2) the accusation or accusations were in fact false, and (3) the evidence is more probative than prejudicial.[36] If the defendant satisfies these three conditions, the trial court will authorize cross-examination of the complaining witness concerning the alleged false accusations.[37] The defendant may thereafter present extrinsic evidence of the false accusations only if the complaining witness denies or fails to recall having made such accusations.[38]

In this case, we find Swindle failed to satisfy the necessary conditions. While the evidence relied upon by Swindle did indicate that M.M. had previously alleged that she had been raped, Swindle did not demonstrate those claims were false.[39]

---

[34] § 27-412(2)(a)(i) through (iii).

[35] See, *State v. Boggs*, 63 Ohio St. 3d 418, 588 N.E.2d 813 (1992); *Miller v. State*, 105 Nev. 497, 779 P.2d 87 (1989); *Clinebell v. Commonwealth*, 235 Va. 319, 368 S.E.2d 263 (1988).

[36] See *State v. Daffin*, 387 Mont. 154, 392 P.3d 150 (2017).

[37] *Id.*

[38] *Id.*

[39] See *State v. Welch*, 241 Neb. 699, 490 N.W.2d 216 (1992).

The evidence relied upon by Swindle indicates that M.M. did in fact have sexual relations with other men prior to making the accusations. The evidence also indicates that M.M. was 14 years of age at the time of these other encounters. Section 28-319(1)(c) provides that a person under 16 years of age may not legally consent to sexual penetration by an actor over 19 years of age.[40] As the evidence indicates that at least one of the men with whom M.M. had sexual relations was 24 years of age and that Swindle did not demonstrate the age of any of the others or that M.M. recanted any of the allegations, Swindle failed to show M.M.'s accusation that she was raped was false.

We must continue our analysis, however, to consider whether the exclusion of the evidence in question violated Swindle's constitutional right to confront his accuser.

[15,16] The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."[41] We have recognized that in limited circumstances, a defendant's right to confrontation can require the admission of evidence that would be inadmissible under the rape shield statute.[42] This court has held that an accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.[43]

---

[40] See *In Interest of J.M.*, 223 Neb. 609, 391 N.W.2d 146 (1986).

[41] U.S. Const. amend. VI.

[42] See, *Ford*, *supra* note 4; *Lessley, supra* note 3; *State v. Johnson*, 9 Neb. App. 140, 609 N.W.2d 48 (2000).

[43] *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996).

In this case, Swindle was not absolutely prohibited from impeaching M.M. on cross-examination. Swindle was permitted to ask M.M. whether she had run away on multiple occasions and whether she was trying to "blow it out of proportion" when she was caught. The court's exclusion of evidence concerning M.M.'s prior false claims of rape would not have given the jury a significantly different impression of her credibility. M.M. had already admitted on direct examination that she lied about her age and that "when [she] usually ran away, [she] would have an older male take [her] somewhere or back to their [sic] place." She also admitted that when she was first interviewed by a detective, she falsely stated that the defendant had a gun, and said that she was scared of the defendant and "was trying to blow the story out of proportion." There was evidence before the jury upon which Swindle could have argued that M.M.'s version of the events was not to be believed.

We also find the excluded evidence was not so relevant and probative that it triggered Swindle's constitutional right to confrontation.[44] The excluded evidence was limited to prior sexual contact with people other than Swindle. This evidence concerned a collateral issue that did not have any relevance as to whether Swindle had assaulted M.M. As discussed above, consent is not a defense to sexual assault of a child. And even if M.M. were not a child, Nebraska's rape shield statute recognizes that consent to sex with one person is not consent to sex with all people. There is simply no relevant connection between M.M.'s alleged prior false claims of rape and the crimes at issue. Swindle sought to discuss M.M.'s past sexual conduct in order to undermine her credibility for the improper purpose of arguing that Swindle's assault of M.M. did not take place. There is no indication that Swindle was prevented from asking M.M. directly whether she falsified her claims of

---

[44] See *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

assault in this case. Swindle had a full and fair opportunity to confront his accuser.

We determine that the district court did not abuse its discretion when it determined that Swindle's questions about M.M.'s prior sexual conduct were irrelevant.

### 3. Court Did Not Err in Overruling Swindle's Motion for Mistrial Based on Prosecutorial Misconduct

#### (a) Additional Background

Swindle's counsel also moved for a mistrial based on the argument that the prosecution engaged in an improper presentation of the evidence. In its opening statement, the prosecution stated that "[M.M.] will tell you that [Swindle] didn't ejaculate inside of her vagina. Instead, he pulled out and ejaculated into 15-year-old [M.M.'s] mouth." The prosecution also stated that "[s]he'll be able to tell you that [Swindle] had a gun. She can describe that gun to you. It was a handgun. She was terrified of what would happen if she tried to leave that hotel room." These two predictions of M.M.'s testimony were not borne out at trial and were not repeated by the State in its closing argument.

Swindle argues the State knew or should have known that these aspects of its opening statement were inaccurate and that its actions constituted prosecutorial misconduct. As discussed above, contrary to the State's opening statement, M.M. admitted on direct examination that she lied to police when she first reported that Swindle had threatened her with a gun. With respect to the State's comment about ejaculation, Swindle argues that a nurse's forensic examination report indicated there had been no ejaculation. He claims the State intended to inflame the jury with its opening statement, and later acted unfairly by calling the nurse to testify before M.M., hear the nurse tell the jury there was no evidence of ejaculation, and then decline to ask M.M. about ejaculation during her testimony. Swindle argues the references to ejaculation and the gun

during the State's opening statement were the "most dramatic" and "fundamental" and the "most offensive" aspects of the State's case.

### (b) Disposition

[17,18] A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[45] A trial court is vested with considerable discretion in passing on a motion for mistrial in order to more nearly effectuate the ends of justice.[46]

[19,20] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[47] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[48] Though Swindle identified two contradictions between the State's preview of the evidence and M.M.'s testimony, there was no misconduct.

During its opening statement, the State previewed evidence that Swindle sexually assaulted M.M. and had her perform sexual acts with other men for financial gain. These claims were supported through testimony at trial. Neither ejaculation nor use of force are elements of the crime of sexual assault of a minor or sex trafficking of a minor.[49] Swindle's argument regarding the State's incorrect predictions of the evidence ignores the nature of the crimes at issue in this case.

The pretrial investigation of M.M.'s assaults yielded conflicting evidence concerning whether Swindle had ejaculated.

---

[45] *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018); *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018).

[46] See *Castillo-Zamora, supra* note 2.

[47] See *Cotton, supra* note 45.

[48] See *id*.

[49] §§ 28-319.01 and 28-831(1).

A police report described that "it took [Swindle] a while to ejaculate and when he finally did, he ejaculated in her mouth." Yet, the nurse's report concerning multiple sexual assaults of M.M. marked that there had been no ejaculation associated with penetration of the mouth. These facts and M.M.'s diagnosed mental state created some uncertainty about what her testimony would be. Swindle's own counsel recognized this in his opening statement when he said, "I don't think I've ever been in a situation in a courtroom where I'm less certain of what someone's gonna say. I don't know what these people are gonna say."

In the context of the trial, the State's comment that M.M. would testify that Swindle threatened her with a gun was not imperative given that both A.R. and Villanova-White testified Swindle had indirectly threatened them with his handgun. Because M.M. admitted that her statements about the gun were not true and that the State's incorrect claims during its opening statement were not later repeated, we cannot conclude there was any effort to mislead the jury. Swindle's claim of prosecutorial conduct is without merit.

[21,22] Even if there were misconduct, there is no evidence that Swindle was prejudiced. Not every variance between a prosecutor's advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given and the remarks are not crucial to the State's case.[50] Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[51]

The court instructed the jury that "[s]tatements and arguments by the lawyers for the State and for [Swindle] are not evidence," and there is no indication the jury did not follow this instruction. We determine that the district court did not abuse its discretion in overruling Swindle's motion for mistrial.

---

[50] *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

[51] *Id.*

### 4. Court Did Not Err in
### Admitting Statements
### by Swindle

In his next assignment of error, Swindle argues the court erred by admitting statements that he made. Swindle argues that Villanova-White was permitted to paraphrase his words and that his out-of-court statements cannot be admitted unless a witness is able to recite the specific words that he used rather than relay the "general tenor" of his comments.[52]

[23,24] Based on our discussion of the record below, we agree with the State that Swindle did not articulate this objection to the trial court. On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial.[53] Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.[54]

In explaining his assignment of error, Swindle points to four portions of Villanova-White's testimony that where admitted over his objection. Swindle's objections included hearsay, form of the question, and foundation.

[25] "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[55] It is a fundamental rule of evidence that a statement is not hearsay if it is offered against a party and is the party's own statement.[56]

[26] The first objection came as a hearsay objection to Villanova-White's testimony that Swindle "had his way of

---

[52] Brief for appellant at 23.

[53] *Schwaderer, supra* note 1.

[54] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[55] Neb. Rev. Stat. § 27-801(3) (Reissue 2016).

[56] See § 27-801(4)(b)(i).

threatening without really threatening, but he would mention all the time about how many people he would beat up and gun activity and things like that." The court presumably overruled the objection, because Villanova-White's testimony concerned nonhearsay statements made by a party opponent. Where the reason for a trial court's overruling of a hearsay objection is left at large, arguably, it is the opponent's burden to demand an explanatory ruling.[57] Swindle did not then argue that § 27-801(4)(b)(i) did not apply absent the recital of his precise statement. Therefore, Swindle failed to meet his burden to show that Villanova-White's testimony was inadmissible. The court did not abuse its discretion in overruling Swindle's hearsay objection.

[27] The second objection was a form and foundation objection when the prosecution asked Villanova-White, "Based on conversations that you had with [Swindle], do you know if [A.R.] was ever able to keep any of the money that she made from the business?" Swindle objected as to the form of the question and that it called for a narrative. The court overruled the objection and allowed Villanova-White to answer. The question permitted Villanova-White to answer yes or no as to whether she had knowledge regarding A.R.'s being allowed to keep any money. In response to the question, Villanova-White stated, "No, she was never able to keep the money." After the answer was given, Swindle did not object to the answer on the ground that the answer was a voluntary statement or for some specific reason such as hearsay or a conclusion of the witness.[58] Failure to make a timely objection waives the right to assert prejudicial error on appeal.[59] As a result, Swindle waived any error which may have occurred.

The third objection was an "[a]sked and answered objection" when the prosecution asked Villanova-White why

---

[57] *Henry, supra* note 54.

[58] *Ford, supra* note 4.

[59] *Schwaderer, supra* note 1.

Swindle called A.R. a "bitch." The court sustained the objection as to being a compound question. The prosecution then asked Villanova-White why Swindle was angry, to which Swindle objected on the ground that the question had been asked and answered. The court overruled the objection, and Villanova-White answered, "I know that it was always about money. It was always having to do with money." Villanova-White's answer was based on her recollection. It did not include hearsay evidence and, according to the record, was not cumulative. The court did not err in overruling Swindle's objection.

Finally, Swindle made a foundation objection to a line of questioning about why Swindle did not want A.R. to leave the house. Swindle asked that the State lay in its questions to Villanova-White "the typical foundational requirements" of specific times, dates, and places. The court then required the State to lay foundation. The State asked whether Villanova-White had conversations with Swindle between March and July 2015 about why he did not want A.R. to leave. Villanova-White responded that she did, and the State asked her what Swindle said in those conversations. Swindle objected based on foundation, and the court overruled his objection. Villanova-White answered, "He didn't want her to leave because he was making — she was making him money and that he could keep track of her."

[28] Swindle did not object that Villanova-White's answer did not contain his exact statement. In addition, Swindle has not cited any authority to suggest that if he had made that objection, the State would have been required to lay additional foundation. A witness who hears an oral admission by a party may testify as to that admission.[60] Swindle has not argued that Villanova-White did not hear his admissions or that she lacked personal knowledge as to why he wanted A.R.

---

[60] See *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995).

to stay at the house. The trial court did not abuse its discretion in overruling Swindle's evidentiary objections. Swindle's assignment of error is without merit.

### 5. Court Did Not Impose Excessive Sentences

Swindle argues that his sentences, which amounted to 180 years' to life imprisonment, were disproportionate, because he had no prior similar criminal history and his sentences exceed those imposed even in certain cases of homicide. The State claims the sentences imposed were all within the statutory limits and that Swindle does not argue otherwise.

The jury found Swindle guilty of four felonies, and the court determined Swindle to be a habitual criminal. Upon conviction of a felony, a habitual criminal shall be sentenced to a mandatory minimum of 10 years' imprisonment and a maximum of up to 60 years' imprisonment.[61] The court sentenced Swindle to consecutive sentences of imprisonment of between 60 years to life on count 1, between 60 years to life on count 2, between 40 to 60 years on count 3, and between 20 to 60 years on count 4.

[29] An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result.[62]

The court's sentencing of Swindle was not inappropriate in this case. Swindle's guilt was largely uncontested. Swindle's theory of defense at trial was that Villanova-White was primarily responsible for the online business and that A.R.'s and M.M.'s prostitutions were voluntary on their part. The evidence left little question, however, that Swindle sexually assaulted M.M. on two separate occasions and that he engaged in sex trafficking of both A.R. and M.M. The

---

[61] Neb. Rev. Stat. § 29-2221 (Reissue 2016).

[62] *Brown, supra* note 6.

court's sentencing is not clearly untenable, given that the State proved that Swindle repeatedly sought out vulnerable victims and used violence and manipulation to force them into his sex trafficking business. The court was within its discretion to impose sentences on the high end of the statutory range. We conclude the court did not abuse its discretion in sentencing Swindle.

## V. CONCLUSION

We conclude that the court's refusal of Swindle's proposed jury instruction was not in error. We further conclude that the district court did not abuse its discretion in overruling Swindle's motions for mistrial and in overruling his evidentiary objections. We conclude the court did not abuse its discretion in sentencing Swindle. We therefore affirm Swindle's convictions and sentences.

AFFIRMED.