IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KEELING

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TANNER D. KEELING, APPELLANT.

Filed September 22, 2020.    No. A-20-173.

Appeal from the District Court for Thayer County: VICKY L. JOHNSON, Judge, on appeal thereto from the County Court for Thayer County: LINDA A. BAUER, Judge. Judgment of District Court affirmed.

Benjamin H. Murray, of Murray Law, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

PIRTLE, RIEDMANN, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Tanner D. Keeling appeals his jury conviction of third degree domestic assault. Keeling alleges that the district court erred in affirming the orders of the county court admitting hearsay testimony and overruling Keeling's motion for mistrial. For the reasons that follow, we affirm.

## BACKGROUND

On March 15, 2019, the State filed a complaint alleging that on or about February 16, 2019, Keeling committed third degree domestic assault in violation of Neb. Rev. Stat. § 28-323(1) (Reissue 2016), which makes it a crime to "(a) Intentionally and knowingly cause bodily injury to his or her intimate partner; (b) Threaten[] an intimate partner with imminent bodily injury; or (c) Threaten[] an intimate partner in a menacing manner." Third degree domestic assault is a Class I

misdemeanor, punishable by up to 365 days in jail. Neb. Rev. Stat. § 28-106 (Reissue 2016). A jury trial on the State's complaint was held on September 5, 2019.

At trial, the alleged victim, K.D., testified that at the time of the events of this case, she and Keeling were involved in an intimate relationship and were engaged to be married. On Friday, February 15, 2019, Keeling went out drinking while K.D. stayed home. Around 11 a.m. the next day, K.D. was awakened by Keeling poking and "bothering" her. K.D. asked Keeling to leave her alone so she could continue sleeping. When Keeling continued to "pinch" her and talk to her, K.D. took a blanket and pillow from the bed and tried to sleep on the couch.

K.D. testified that after she left the bedroom, Keeling yelled after K.D. to "Get back in here" and said "I'll make you come back in here if you don't come back in here." He then "stormed" after K.D. and began to yell at her and hit her. She testified that Keeling "grabbed" her ponytail and "dragged" her off the couch toward the bedroom. While K.D. was on the floor, Keeling hit and kicked her. K.D. testified that Keeling left bruises on her face, back, and shoulder. At some point, Keeling's mother, Wendy Nutsch, heard the two arguing and came upstairs. Nutsch told Keeling to stop, but he did not listen. Eventually Keeling sat down and K.D. was able to get away from him.

K.D. testified that she ran into the bathroom and locked the door. She then took several prescription anxiety pills with the intent to end her life. Keeling and Nutsch remained outside the bathroom door and tried to get inside to stop K.D. After 15 to 20 minutes, K.D. came out of the bathroom and returned to the bedroom. Keeling "jumped on" K.D. and attempted to make her vomit up the pills by putting his hand in K.D.'s mouth. When this proved unsuccessful, Keeling "flipped the bed over" while K.D. was on it and kicked her as she lay on the floor. At some point, Nutsch came into the bedroom and tried to put the mattress back in place.

Shortly after flipping over the mattress, Keeling left the house. Neither K.D., Keeling, nor Nutsch called 911 to get medical attention for K.D. K.D. began to feel drowsy from the effects of the pills she had taken and fell asleep. She testified that when she woke up later that day, Keeling was "right in [her] face" and said to her "I was seeing if you were breathing. You should have chosen a gun. It would have been faster." She testified she was unable to leave the house because her vehicle had a flat tire and because she slept most of February 16 and 17, 2019, due to the drugs she had ingested.

On the morning of February 18, 2019, K.D. woke early and borrowed Keeling's car so she could go to a physical therapy session. K.D. admitted on cross-examination that she may have gone out to buy coffee for Keeling and come back to the house prior to leaving for her appointment. After physical therapy, K.D. went to her friend, Hope Dankenbring's office. K.D. testified that when she spoke with Dankenbring, she was "shaking, crying, scared." She testified she was afraid of going back to the house on account of Keeling's conduct and because she was afraid Keeling would assault her again. K.D. told Dankenbring about the incident on February 16 and then went with her to the sheriff's office to file a report.

Dankenbring testified at trial. She had been acquainted with K.D. since 2012 and was a mother-like figure to K.D. Dankenbring testified that when she saw her on February 18, 2019, K.D. was shaking, crying, and "a total wreck." K.D. showed Dankenbring a bruise on her ribcage and told her that Keeling had left it. Over Keeling's objection, Dankenbring testified that K.D. told

her that Keeling had gone out and gotten drunk the night before and came into their bedroom on February 16 to bother K.D. K.D. told Dankenbring that Keeling "grabbed" K.D. and said he wanted to talk. K.D. told Keeling "no," and he responded by hitting her while she lay in bed. K.D. left the room and went to the couch. Dankenbring testified that according to K.D., Keeling came out of the bedroom, pulled K.D. off the couch by her hair, and continued to kick and hit K.D.

Dankenbring further testified over objection that K.D. had told her she attempted suicide on February 16, 2019, because "[K.D.] was scared and tired of dealing with it, the abuse, and she just couldn't handle it anymore and didn't know any other way to get out, because she had tried before, and [Keeling] always seemed to be able to locate and find her." Dankenbring advised K.D. to go to the sheriff's office and report Keeling's conduct. K.D. agreed to do so if Dankenbring accompanied her. While they were at the sheriff's office, Dankenbring saw K.D. receive text messages from Keeling on her phone. Dankenbring testified that after receiving these messages, K.D. "started shaking more and started crying."

Gerry Merck, K.D.'s psychotherapist, testified that she began treating K.D. in May 2019. Merck diagnosed K.D. with severe post-traumatic stress disorder, which stemmed from an event where K.D.'s "then-fiancé assaulted her and held her against her will." After Merck's testimony, the State rested its presentation of evidence.

Keeling called his mother, Nutsch, to testify in his defense. Nutsch, who testified she was a registered nurse, lived with Keeling and K.D. Nutsch recalled an argument between Keeling and K.D. on February 16, 2019. Nutsch testified she "went upstairs to see what was going on, because [she] could hear them talking or whatever, or arguing." When she went upstairs, Nutsch saw Keeling and K.D. "standing face to face, talking" and then K.D. "got upset and went into the bathroom."

Nutsch denied seeing any bruises or evidence of injuries on K.D. She also denied that there was anything "thrown around" the room. Nutsch testified that after K.D. attempted suicide, she went to the bedroom to lie down and that Keeling went with her. Nutsch denied that Keeling and K.D. continued to argue at that point.

After Keeling left the house, Nutsch stayed in the bedroom and watched over K.D. for the weekend "to make sure she didn't die, I guess." Nutsch testified K.D. took the pills around noon on Saturday and slept off and on until the evening of Sunday, February 17, 2019. She testified that when K.D. woke up, K.D. "acted like nothing happened." Nutsch stated she did not notice anything unusual about how K.D. or Keeling were acting on the morning of February 18.

During cross-examination, the State asked Nutsch, "Your son, Tanner Keeling, has threatened or assaulted you, hasn't he?" and Nutsch answered, "No, he hasn't." The State then asked "Did you call my office and ask how you could get [Keeling] out of the house?" Keeling objected to the question as impermissible evidence under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016), and also on the basis that the question was outside the scope of direct examination. The objection was sustained. Keeling moved for a mistrial, arguing that the State had impermissibly introduced evidence of prior bad acts by acting as a witness at trial. The State argued the question had been asked to show Nutsch was lying. After consideration, the court overruled the motion for mistrial and instructed the jury to disregard the State's question.

After Nutsch's testimony, Keeling rested. The jury found Keeling guilty of third degree domestic assault, and the county court ordered a presentence investigation. On October 28, 2019, Keeling was sentenced to 365 days in jail.

Keeling appealed his conviction and sentence to the district court, and the district court affirmed Keeling's conviction and sentence on February 4, 2020. This appeal followed.

## ASSIGNMENTS OF ERROR

Keeling assigns, restated, that the district court erred and abused its discretion in (1) affirming that hearsay statements made by K.D. to Dankenbring were admissible as excited utterances and (2) affirming the county court's order overruling Keeling's motion for mistrial on the grounds of prosecutorial misconduct.

## STANDARD OF REVIEW

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Thalken*, 299 Neb. 857, 911 N.W.2d 562 (2018). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* But we independently review questions of law in appeals from the county court. *Id.* When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court. *Id.*

We review for clear error the factual findings underpinning the excited utterance hearsay exception, resolving evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

Whether to grant a mistrial is within the trial court's discretion, and we will not disturb its ruling unless the court abused its discretion. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Parminter*, 283 Neb. 754, 811 N.W.2d 694 (2012).

## ANALYSIS

*Hearsay Testimony.*

Keeling asserts that the county court erred in admitting Dankenbring's testimony about hearsay statements made by K.D. on February 18, 2019. Keeling argues that evidence of K.D.'s statements was improperly admitted under the excited utterance exception due to the timing and circumstances of the statements.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat.

§ 27-801(3) (Reissue 2016). Hearsay is generally inadmissible unless an exception applies. The Nebraska Rules of Evidence provide that "[a] statement relating to a startling event or condition" is not excluded by the hearsay rule. Neb. Rev. Stat. § 27-803(1) (Reissue 2016). To qualify as an "excited utterance," a statement must meet the following criteria: (1) there must have been a startling event; (2) the statement must relate to the event; and (3) the statement must have been made by the declarant while under the stress of the event. *State v. Tlamka*, 244 Neb. 670, 508 N.W.2d 846 (1993).

Excited utterances are an exception to the hearsay rule because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them. *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016). The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication. *Id.*

Under this exception, "[s]tatements need not be made contemporaneously with the exciting cause but 'may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated.'" *State v. Jacob*, 242 Neb. 176, 188, 494 N.W.2d 109, 118 (1993). The key requirement is spontaneity, a showing that the statement was made without time for conscious reflection. *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993). The permissible length of time between the statement and the startling event is determined on the unique facts of each case. *Id.* Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning. *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

According to Dankenbring, when she saw K.D. in her office on the morning of February 18, 2019, K.D. was very upset, crying, shaking, and "a total wreck." K.D. showed Dankenbring a bruise on her ribcage and stated she was afraid of returning home. Dankenbring testified that when K.D. received a text message from Keeling, she "started shaking more and started crying."

Keeling argues that K.D.'s statements lacked spontaneity because of the 48 hours that passed between the initial argument with Keeling and the conversation in Dankenbring's office. Keeling notes that during those hours, K.D. slept, had multiple conversations with Keeling and his mother, went out to get coffee in Keeling's car, and attended an hour-long physical therapy session. Keeling asserts that under these circumstances, K.D. "had more than enough time for conscious reflection along with her cup of coffee." Brief for appellant at 15.

However, the evidence shows that when she spoke with Dankenbring, K.D. had spent most of the past 2 days sleeping off an attempted drug overdose, which affected her mental state and diminished her ability for conscious reflection. Additionally, K.D. testified that on one occasion over the weekend, she woke and found Keeling in the room. He then told her: "I was seeing if you were breathing. You should have chosen a gun. It would have been faster." Dankenbring testified that when she saw her on February 18, 2019, K.D. was visibly excited and described her as "a total wreck." The length of time between the inciting event and K.D.'s statements is not dispositive. K.D. was physically assaulted by Keeling, and her statements to Dankenbring related to her altercation with Keeling. Throughout her conversation with Dankenbring, K.D. was visibly upset and clearly still under the stress of those events.

After viewing the facts in the light most favorable to the prosecution, we do not find clear error in the county court's ruling admitting evidence of K.D.'s hearsay statements under the excited utterance exception. See *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011). Therefore, the district court did not err in affirming the county court's ruling.

*Prosecutorial Misconduct and Motion for Mistrial.*

Keeling asserts that the county court erred in denying his motion for mistrial based on prosecutorial misconduct during the State's cross-examination of Nutsch. He argues that the prosecutor's question about whether Nutsch had ever called the prosecutor's office wanting to know how to get Keeling out of her house amounted to "personal factual testimony" intended "to persuade the jury that [Nutsch] was lying." Brief for appellant at 21. Keeling asserts this statement created an impermissible inference that Keeling had previously assaulted Nutsch and that because of this, he had also assaulted K.D. on February 16, 2019.

A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017).

When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *Id.* If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial. *Id.* Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *Id.*

Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *State v. McSwine, supra.*

Prosecutors may not inflame the jurors' prejudices or excite their passions against the accused. *State v. Hernandez, supra.* Further, under § 27-404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

Keeling argues that the State's question about whether Nutsch had attempted to remove Keeling from her house suggested he had previously assaulted Nutsch and, therefore, made it more likely for the jurors to believe that Keeling would be involved in further criminal acts, such as those with which he was charged in this case. He argues that the prosecutor's misconduct in asking this question of Nutsch prejudiced his right to a fair and impartial trial.

The record shows the prosecutor's question was part of a series of questions addressing concerns about Nutsch's credibility. The prosecutor's statement was not focused on proving any prior conduct of Keeling's. The State did not elicit any testimony about the reason Nutsch may have wanted Keeling out of her house. The questions were not invited by Keeling's attorney, but the isolated nature of this questioning weighs against a finding of prejudice. A curative instruction was given to the jury at Keeling's request, both at the time of the initial objection and after the court ruled on Keeling's motion for mistrial. Finally, there was significant evidence from K.D. and Dankenbring's testimony supporting the elements of third degree domestic assault. Having considered the relevant factors, to the extent the State's questioning may have been improper, it was not prejudicial. Nor was the State's statement of such a nature that any damaging effect could not be cured by the court's instruction.

We cannot say it was an abuse of the county court's discretion to deny Keeling's motion for mistrial, and the district court did not err in so affirming.

CONCLUSION

We conclude that the district court did not err in determining there was no clear error in the county court's admission of K.D.'s hearsay statements, nor did the district court err in finding the county court had not abused its discretion when it overruled Keeling's motion for mistrial. Accordingly, the order of the district court is affirmed.

AFFIRMED.