Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/14/2025 09:09 AM CST

**State of Nebraska, appellee, v.
Evan J. Mielak, appellant.**

___ N.W.3d ___

Filed January 7, 2025.    No. A-24-064.

1. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

2. **Jury Instructions: Judgments: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law. On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.

3. **Sexual Assault: Words and Phrases.** Under Neb. Rev. Stat. § 28-318(8)(a) and (b) (Cum. Supp. 2022), the inquiry is not just whether the defendant thought the victim expressed a lack of consent, but whether a reasonable person would have known the victim's words and conduct were a "genuine and real" refusal of consent.

4. **Sexual Assault: Proof.** Subsections (b) and (c) of Neb. Rev. Stat. § 28-318(8) (Cum. Supp. 2022) do not set forth additional independent alternative means to show that sexual penetration was without consent. Instead, these subsections inform the nature of the proof necessary to show one of the definitions set forth in subsection (a) of § 28-318(8).

5. **Convictions: Evidence: Appeal and Error.** When a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of either alternative, and

thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt.

6. **Criminal Law: Evidence: Jurors.** The "without consent" theory and the "incapable of resisting" theory are two distinct ways of committing same offense, and thus, where there is evidence of both theories, a juror may determine guilt based on either.

7. **Sexual Assault.** Nebraska case law does not set forth some mythical level of intoxication after which a person is considered to be incapable of resisting for purposes of Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016). A victim can be incapable of resisting or appraising the nature of a perpetrator's conduct without suffering from an abnormality or substantial mental or physical impairment like severe intoxication.

8. ____. Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016) requires an individualized inquiry into the victim's capacity.

9. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

10. ____. It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

11. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

12. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

13. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

14. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given.

15. **Jury Instructions: Proof: Records: Appeal and Error.** Appellants are required to show that their tendered jury instruction was a correct statement of law and that it was warranted by the evidence; to do so, appellants need to include their proposed instruction in the record on appeal.

16. **Jury Instructions.** In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.

17. **Jury Instructions: Statutes: Legislature: Intent.** Although the law does not require that a jury instruction track the exact language of the statute, using the specific language of a statute is an effective means of implementing the intent of the Legislature.

18. **Jurors.** Jurors are accepted because they are men and women of common sense and have a common understanding of words ordinarily used in our language.

19. **Jury Instructions: Words and Phrases.** In instructing a jury, the trial court is not required to define language commonly used and generally understood.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Evan J. Mielak appeals his conviction in the district court for Lancaster County for first degree sexual assault. He argues that there was insufficient evidence to support his conviction. He also assigns that the district court erred in overruling his objection to jury instruction No. 3 and failing to give the jury his proposed instructions. We affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

In April 2023, the victim, H.S., was living in an apartment with her sister, Hannah S., and four male roommates: Caden F., Trey H., Daniel P., and Mielak. On April 7, 2023, all the roommates, excluding Daniel, were socializing in their apartment.

The group decided to play a drinking game that involved taking or finishing a drink at certain intervals, resulting in the players consuming large amounts of alcohol in a short period of time. H.S. testified that the game was "a little bit too fast for everyone." As a result, Caden became sick and vomited into the kitchen sink.

About an hour into the game, H.S. also began to feel unwell. She testified that she had consumed approximately five alcoholic seltzer drinks and was drunk. H.S. went into her bathroom and vomited. H.S. was concerned that she would vomit again and did not feel well enough to leave the bathroom. H.S. fell asleep in the bathroom next to the toilet, lying face down on her stomach.

Caden testified that H.S. was "pretty drunk" from the drinking game, "[had] to be awfully drunk to sleep on the floor," and estimated H.S.' level of intoxication as around a "seven . . . out of ten." He and the other roommates encouraged Hannah to check on H.S. and make sure that she was not "in need of any immediate help." Hannah obliged and went into the bathroom with some water for H.S. Hannah testified that H.S. mumbled something but did not move or reach for the water. Hannah set the water down next to H.S. When Hannah left the bathroom, H.S.' head was near the toilet, and she was lying face down with her feet extending toward the door.

As Hannah exited the bathroom and closed the door, she found Mielak standing just outside the door. Hannah told Mielak not to enter the bathroom. Hannah testified that Mielak expressed a desire to help H.S., but Hannah responded that she could take care of H.S. alone. Hannah also reminded Mielak that no male roommates were allowed in that bathroom. Before moving in, the roommates made an agreement that the bathroom closest to H.S. and Hannah's bedroom was for female use only. All the male roommates understood that they were to stay out of that bathroom. After reminding Mielak of this rule, Hannah went into Trey's bedroom on the opposite side of the apartment to take a phone call. Hannah testified

that she went to Trey's room because "the guys were . . . in the living room partying" and Trey's bedroom was quiet.

H.S. testified that after falling asleep on the bathroom floor, the next thing she remembered was waking up and realizing another person was in the bathroom with her. The individual did not speak to H.S., and she was still lying face down on the floor, so she initially guessed it was Hannah. The individual, later identified as Mielak, crouched down next to H.S., pulled down her pants and her underwear, and inserted his fingers into her vagina. H.S. testified that in reaction to this contact, she "froze up" and could not move. She could not estimate how long the penetration lasted but testified that "[i]t felt like a really long time." H.S. deduced that the individual was Mielak because while he was touching her, she could hear Caden's and Trey's voices from the living room.

H.S. testified that she stayed immobile on the floor because she was "really scared" of Mielak and was afraid that he would do something worse if she reacted. At some point, Mielak stopped touching H.S. and began to masturbate. H.S. testified that she remained immobile on the floor. Eventually, Mielak stopped touching himself. H.S. testified that Mielak "must have" pulled up her underwear and her pants and exited the bathroom, closing the door behind him. Mielak did not say anything to H.S. before leaving the bathroom. After he left, H.S. stayed in the bathroom and cried.

Not long after, H.S. left the bathroom and went searching for Hannah in the bedroom they shared. Hannah was not there. H.S. heard Mielak calling out to her from the hallway and hid from him in the closet. Mielak entered her bedroom, and H.S. immediately left, telling Mielak she was looking for Hannah.

H.S. found Hannah taking a phone call in Trey's bedroom. H.S. closed Trey's bedroom door and told Hannah that Mielak had "fingered" her and that she had heard him "jerking off." While this discussion was taking place, Trey wanted to know why H.S. and Hannah were in his room. When he asked,

Hannah told him everything was fine. However, Trey testified that when he checked on H.S. and Hannah, he could hear through the door that H.S. was crying.

Hannah eventually left Trey's bedroom and confronted Mielak. H.S. followed Hannah and screamed expletives at Mielak. H.S. testified that she did so "[b]ecause [Mielak] raped me, and I was mad." Trey testified that during this encounter, H.S. was "very hysterical," which was out of character for her.

Caden and Trey were confused by the dispute between H.S., Mielak, and Hannah. In explanation, Mielak told Caden and Trey that he had "screwed up" and that "things [wouldn't] be the same again." Trey asked Mielak to clarify what he meant, and Mielak began to cry and admitted that he had "inappropriately touched" H.S.

To help H.S. calm down, H.S. and Hannah briefly left the apartment. When they returned later that night, none of the other roommates were awake, and they went to bed. Three days later, Daniel, the fourth male roommate who was not present during these events, received a message from Mielak stating that they needed to talk. Daniel testified that he called Mielak, and Mielak told him that he had "inappropriately touched [H.S.]" Mielak also told Daniel that at H.S.' request, he had moved out of the apartment. Excluding H.S., none of the roommates have spoken to Mielak since he removed himself from the apartment.

H.S. testified that she did not immediately contact law enforcement because she and Mielak "were really good friends" and she had a hard time separating herself from those feelings. However, a week after the event took place, H.S. filed a report against Mielak at the Lincoln Police Department. H.S. spoke to an investigator, Tyler Nitz, who suggested that she make a "controlled phone call" to Mielak. Nitz explained that a controlled call is when a victim contacts the alleged perpetrator and confronts him or her about the alleged abuse. Nitz provided H.S. with the necessary recording equipment to make a controlled call.

H.S. made a controlled call to Mielak on April 17, 2023. At trial, a recording of the call was offered by the State and received into evidence. During the call, Mielak was crying, making some of his responses unintelligible. Mielak began the conversation by stating, "the first thing I want to say is I'm sorry. I know there is nothing I can say." H.S. responded that while he described the sexual contact as merely "inappropriate touching" to their male roommates, he had in fact "fingered [her] and touched [himself]." Mielak then began crying, stating that he did not remember what happened beyond entering the bathroom. However, Mielak stated that he believed H.S.' account of the sexual contact. Mielak apologized to H.S. several times, stated that he did "something horrible," and called himself a "horrible person." He said that he felt "like a monster" for what he did to H.S.

H.S. testified that she has not spoken to or contacted Mielak since the controlled call. H.S. denied ever dating Mielak, expressing a romantic interest in him, or kissing him. She also testified that Mielak had never expressed a romantic desire toward her prior to the incident. H.S. testified that if Mielak had asked for her consent to touch her on April 7, 2023, she would not have given him consent.

## 2. Procedural Background

On June 7, 2023, the State charged Mielak with first degree sexual assault, a Class II felony. A jury trial began on November 15 and ended on November 17. After the State presented its evidence and rested, Mielak made an oral motion to dismiss the charge against him. Mielak's counsel argued that there was no evidence that (1) H.S. expressed a lack of consent to sexual penetration or (2) H.S. was incapable of expressing a lack of consent. Thus, Mielak concluded that the evidence was insufficient to find him guilty of first degree sexual assault.

The State countered that H.S. manifested a lack of consent by entering her private bathroom, lying face down on the floor, and going to sleep. The State also argued that H.S. was unable to consent because she was asleep and intoxicated. After the

matter was submitted, the court overruled the motion. Mielak rested without presenting any evidence to the jury.

Outside the presence of the jury, the court and the parties conducted a formal jury instruction conference. Mielak objected to jury instruction No. 3, which provides the elements of first degree sexual assault. The instruction stated that the State had to prove beyond a reasonable doubt that Mielak subjected H.S. to sexual penetration either "(a) without [her] consent" or "(b) when . . . Mielak knew or should have known that [H.S.] was mentally or physically incapable of resisting or appraising the nature of his conduct." Mielak's counsel argued that the "should have known" language was "below the constitutional requirement of some element of mens rea." His counsel elaborated that first degree sexual assault requires some element of criminal negligence "beyond mere breach of a duty or breach of a standard of care" and without defining the phrase "should have known," the jury could find Mielak guilty under a "simple negligence standard."

Mielak's counsel referenced an earlier version of the proposed jury instructions and one instruction in particular that included a definition of the word "negligently" taken from another statute. That statute is unidentifiable from the record on appeal, and the proposed instruction is not included in our record. Mielak suggested that the court could use language from the proposed instruction to cure the alleged defect in jury instruction No. 3.

The court overruled Mielak's objection, stating that the level of intent was part of the crime and that jury instruction No. 3 used the language provided in the first degree sexual assault statute. The court also noted that the definition of "negligently" that Mielak's counsel wanted to provide to the jury was taken from an unrelated statute that did not have "any pertinence" to this case. The court concluded that jury instruction No. 3 was appropriate as given.

The matter was then submitted to the jury. During deliberations, the court received two questions from the jury. The first

question asked: "Instruction Number V - Can we be provided with a definition of conduct as stated in section (a) within 'without consent' definition? For example - Is lack of action (inaction, laying on floor) considered 'conduct.'" Instruction No. 5 provided the jury with a list of defined statutory terms, including the phrase "without consent." The second question asked: "Is action prior to the incident considered 'conduct.' For example - door being shut, her laying on floor, closing her eyes."

Mielak provided the court with proposed instructions to each question. For the first question, Mielak proposed the following: "Conduct as defined in these instructions [is] an affirmative act that conveys to the other person a lack of consent by word or conduct. Inaction when the person is capable of saying something or doing something to express a real and genuine lack of consent, is not conduct." His proposed instruction to the second question was: "The conduct expressing a lack of consent must be directed to the sexual conduct that is the subject of the charge."

Mielak's counsel argued that the questions went to the "the heart of [Mielak's] motion to dismiss," which was that the evidence was insufficient to establish that H.S. actively expressed a lack of consent or lacked the ability to do so. Mielak asserted that his proposed instructions would indicate that H.S. had a duty, if capable, to commit some act expressing her lack of consent. The State objected to Mielak's proposed instructions, arguing that conduct was distinct from action and that Mielak's responses were not correct statements of law.

Once the matter was submitted, the court stated that "action" was not synonymous with "conduct" and that the jury could understand the meaning of the word "conduct" without further instruction. The court also stated that the instructions it had already provided were adequate. Thus, the court ruled that its instruction to both questions would be as follows: "Members of the jury, you have received all the evidence and instructions of law which are applicable to this case."

The jury ultimately returned a verdict of guilty for first degree sexual assault. Mielak motioned for a new trial or, in the alternative, requested that the court vacate the judgment of the conviction due to irregularities in the court proceedings, misconduct, error of law, and the evidence being insufficient to support the verdict. The court's order addressing this motion indicates that Mielak also filed a motion for judgment notwithstanding the verdict, but that motion does not appear in our record. The court denied both motions, finding that the evidence was sufficient to convict Mielak. The court specifically found:

> Under all of the circumstances, a jury could properly convict [Mielak] for digitally penetrating the victim after she had expressed her desire to be left alone by leaving the gathering to go to her private quarters, and [Mielak] then following her to that bathroom, opening the seal of her closed door, crossing the threshold into her private space, squatting down beside her, and while she remained completely frozen face down, removing her pants and underwear. Under these circumstances, the jury could conclude that no additional conduct was required of the victim to express her lack of consent to [Mielak's] digital penetration of her vagina.

The court also found that the jury could have concluded that H.S. was too intoxicated to consent.

Mielak was sentenced to 4 to 8 years' imprisonment and was required to register under Nebraska's Sex Offender Registration Act. Mielak appeals.

### III. ASSIGNMENTS OF ERROR

Mielak assigns that the evidence was insufficient to support his conviction. He also assigns that the district court erred in (1) failing to dismiss the case at the close of the State's evidence, (2) failing to grant his motion for judgment notwithstanding the jury's verdict, (3) overruling his objection to jury instruction No. 3, and (4) failing to give his proposed instructions to the jury's questions submitted during deliberations.

## IV. STANDARD OF REVIEW

[1] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020).

[2] Whether jury instructions given by a trial court are correct is a question of law. *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

## V. ANALYSIS

### 1. Sufficiency of Evidence

Mielak's first three assignments of error concern the same central issue: whether the evidence presented at trial was sufficient to convict him of first degree sexual assault. After viewing and construing the evidence in a light most favorable to the State, we conclude that the evidence was sufficient to support Mielak's conviction.

[3] Neb. Rev. Stat. § 28-319(1) (Reissue 2016), provides, in relevant part, that "[a]ny person who subjects another person to sexual penetration (a) without the consent of the victim [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct" is guilty of first degree sexual assault. The statutory definition of "[w]ithout consent" is as follows:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the

victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so[.]

Neb. Rev. Stat. § 28-318(8) (Cum. Supp. 2022). Under § 28-318(8)(a) and (b), the inquiry is not just whether the defendant thought the victim expressed a lack of consent, but whether a reasonable person would have known the victim's words and conduct were a "genuine and real" refusal of consent. See *State v. Gangahar*, 9 Neb. App. 205, 609 N.W.2d 690 (2000).

[4] The Nebraska Supreme Court has held that subsections (b) and (c) of § 28-318(8) do not set forth additional independent alternative means to show that sexual penetration was without consent. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018). Instead, these subsections inform the nature of the proof necessary to show one of the definitions set forth in subsection (a) of § 28-318(8). *State v. McCurdy, supra.* Subsection (b) of § 28-318(8) describes the nature of resistance that must be shown in circumstances where resistance by the victim is relevant to proving that sexual activity was without consent. *State v. McCurdy*, 301 Neb. at 355, 918 N.W.2d at 301. Subsection (c) of § 28-318(8) describes circumstances in which it is not necessary to show resistance by the victim in order to prove that sexual activity was without consent. *State v. McCurdy, supra*.

[5,6] The State presented to the jury two theories under which Mielak could be found guilty of first degree sexual assault. One theory was that Mielak knew or should have

known that H.S. was mentally or physically incapable of resisting or appraising the nature of Mielak's conduct due to her intoxication. The second theory was that H.S. expressed a lack of consent through her conduct. When a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt. *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024). See, also, *State v. Npimnee*, 316 Neb. 1, 2 N.W.3d 620 (2024) ("without consent" theory and "incapable of resisting" theory are two distinct ways of committing same offense, and thus, where there is evidence of both theories, juror may determine guilt based on either).

### (a) Incapability Theory

After reviewing the record in a light most favorable to the State, we conclude that the State adduced sufficient evidence to support the theory that Mielak sexually penetrated H.S. when he knew or should have known that H.S. was mentally or physically incapable of resisting or appraising the nature of his conduct.

There was abundant testimony concerning H.S.' intoxication and Mielak's knowledge of her intoxication. Both H.S. and Mielak had participated in the drinking game with their roommates. H.S. testified that she drank five alcoholic seltzers in an hour and was drunk when she went into the bathroom and vomited. Mielak was present for all these events.

Due to H.S.' level of intoxication and the length of time she spent in the bathroom, Hannah was urged by the other roommates to check on H.S. Caden testified that H.S. had to be "awfully drunk" to sleep on the bathroom floor. H.S.' testimony also indicated that there were gaps in her memory, including not remembering how her underwear and pants were pulled up after the assault.

Mielak knew that after H.S. vomited, she was in a vulnerable state, having told Hannah that he wanted to enter the

bathroom and "help" H.S. Upon entering the bathroom, he did not announce himself to H.S., nor did he inquire as to her state of mind or consciousness. He did not ask whether H.S. was asleep or awake, nor did he confirm whether she wanted sexual contact with him. H.S.' testimony indicates that she was sleeping when Mielak entered and was not fully conscious before he initiated the sexual contact.

The jury could have also found that H.S.' physical demeanor informed Mielak that H.S. was incapable of resisting or appraising the nature of his conduct. Based on H.S.' and Hannah's testimonies, when Mielak entered the bathroom, he would have observed H.S. lying on the floor, face down, facing away from the door. H.S. did not move or speak while Mielak was in the bathroom, and thus, he had no indication that H.S. was even conscious when he penetrated her. Mielak's own statements acknowledging the wrongfulness of his actions also support a finding that he recognized that H.S. was incapable of resisting his actions at the time he exercised them.

[7,8] To the extent that Mielak argues that H.S. was able to resist or appraise the nature of his conduct because (1) soon after the sexual contact, she was moving around the apartment and discussing the incident, and (2) she was able to recall and testify about the sexual penetration, this argument is without merit. In reviewing a criminal conviction, an appellate court does not pass on the credibility of witnesses or reweigh the evidence. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). Further, Nebraska case law does not set forth some mythical level of intoxication after which a person is considered to be incapable of resisting for purposes of § 28-319(1)(b). See *State v. Npimnee*, 316 Neb. 1, 2 N.W.3d 620 (2024). A victim can be incapable of resisting or appraising the nature of a perpetrator's conduct without suffering from an "'abnormality' or 'substantial mental or physical impairment'" like severe intoxication. *Id.* at 9-10, 2 N.W.3d at 628. Section 28-319(1)(b) requires an individualized inquiry into the victim's capacity. *State v. Npimnee, supra.*

Viewing the evidence in a light most favorable to the State, a fact finder could conclude that H.S. was so intoxicated and ill as to be incapable of resisting or appraising the nature of Mielak's actions but still able to react afterward and recall the assault. H.S. testified that during the penetration, she "froze" from fear, and a jury could find that this was due to her intoxication and illness combined with the remaining circumstances present. This assignment of error is without merit.

### (b) Lack of Consent Theory

For the sake of completeness, we also consider whether there was sufficient evidence for the jury to find that Mielak subjected H.S. to sexual penetration without her consent. Mielak argues that when reading the statute holistically, the law requires that all able victims actively express a lack of consent through words or conduct. He argues that if the victim chooses not to actively express refusal, the elements of first degree sexual assault under § 28-319(1)(a) are not met.

The State disagrees that the statute requires victims to communicate their lack of consent strictly through active expression. In support of its position, the State cites Black's Law Dictionary 372 (12th ed. 2024) for the definition of the word "conduct," which is "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal; the manner in which a person behaves; collectively, a person's deeds." The State argues that based on this definition, inactive behavior can be considered as part of a victim's conduct. In this case, the State asserts that such conduct would include H.S.' going to her private bathroom, vomiting, and falling asleep lying face down on the floor. According to the State, this conduct clearly indicated that H.S. was not consenting to any sexual contact.

The issue of what constitutes conduct under the statute appears to be a novel one. However, the statute provides clarification on the nature of proof necessary to convict where resistance by the victim is relevant to proving that sexual activity was without consent. Section 28-318(8) states that the victim need only resist through words or conduct to make the

victim's refusal to consent genuine and real and to reasonably make known to the actor the victim's refusal to consent.

When viewing the evidence in a light most favorable to the State, we find that a reasonable person under the limited and specific facts of this case would have understood that, based on H.S.' conduct, H.S. refused to consent to sexual contact. The evidence also establishes that Mielak knew that she had refused to consent to sexual activity with him. Mielak immediately and repeatedly confessed to and apologized for his actions. On the night of the assault, Mielak was distraught, cried, and admitted to Caden and Trey that he had "inappropriately touched" H.S. Mielak admitted to "inappropriately touching" H.S. for a second time on a phone call with Daniel days after the assault. Additionally, Mielak attempted to remedy the situation by removing himself from the apartment. He also detached himself from the entire friend group afterward, which the jury could find indicated shame or embarrassment arising from his actions.

Mielak's admissions during the controlled call with H.S. further show that he knew that H.S. had refused to consent. Throughout the call, Mielak was distraught and repeatedly apologized to H.S. for his actions. He described himself as a "horrible person" and stated that he felt "like a monster" for what he did to H.S.

Collectively, these behaviors show that Mielak immediately and fully understood that he sexually penetrated H.S. without her consent. The question then becomes how Mielak came to that understanding. There was no evidence that he compelled her to submit due to force or coercion, that she expressed a lack of consent through words, or that she was deceived into giving him consent. That leaves for consideration only H.S.' conduct.

As both parties acknowledge, the term "conduct" is not defined by the statute. Further, neither party could find, nor could this court identify, controlling case law detailing what behaviors constitute conduct under the statute. Instead, Mielak

proposes his own definition based on his reading of the statute, and the State relies on a Black's Law Dictionary definition.

[9,10] Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning. *State v. Jones*, 317 Neb. 559, 10 N.W.3d 747 (2024). It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute. *Id.*

We find that under the limited facts of this case, "conduct" is not limited solely to active expression, as Mielak argues. According to the Black's Law Dictionary definition, conduct is a more expansive term that encompasses all the ways in which a person behaves in a specific context. While we decline to expressly adopt this definition, we find that an individual's conduct is heavily dependent upon the facts of each case. Depending on the circumstances at hand, inaction could be a component of an individual's conduct. With this understanding, we review the evidence in a light most favorable to the State to determine whether the jury could find that under these unique circumstances, H.S.' conduct expressed her lack of consent.

Before and during Mielak's sexual penetration of H.S., she was lying face down, immobile, on the bathroom floor. Mielak could not see H.S.' face or determine if her eyes were open. Further, H.S. did not stir upon his entrance, nor did she move her face from the floor. As stated above, her testimony indicates that she was sleeping when Mielak initially entered the bathroom.

The relationship between H.S. and Mielak prior to the penetration contributes to the context of the sexual contact, and thus further informed the jury of H.S.' conduct. Prior to the sexual contact, H.S. and Mielak had no romantic or sexual relationship. They were friends and roommates only. Thus, there was no reason for Mielak to believe that H.S. was willing to engage in sexual contact with him, especially when she was asleep on the bathroom floor.

The physical space in which the assault took place is also informative of the context and H.S.' conduct. Before the roommates moved into the apartment, they had agreed to abide by an apartment rule that no male roommates were allowed in H.S.' bathroom. H.S. went into her bathroom to vomit and fall asleep. Further, Mielak was explicitly told by Hannah not to enter that room that night, because H.S. was ill due to alcohol intoxication. The door to the bathroom was closed, and Mielak had no invitation to enter. Despite having two direct instructions to stay out of the bathroom, Mielak entered that space.

To summarize, Mielak, having no prior sexual or romantic history with H.S., entered her bathroom when he was prohibited from doing so, discovered her sleeping on the bathroom floor after she vomited due to intoxication, and proceeded to sexually penetrate her while she remained immobile. Based on these specific facts, we conclude that the jury received sufficient evidence to find that H.S.' conduct communicated the message that she was denying consent to sexual penetration, that her refusal was reasonably made known to Mielak, and that Mielak understood the communication provided to him. Accordingly, the evidence supports the theory that H.S. expressed a lack of consent through her conduct and that Mielak sexually penetrated H.S. without her consent.

## 2. Jury Instructions

[11,12] Mielak claims that the district court erred in instructing the jury in two respects. Before we reach the merits of these assignments of error, we briefly review the legal framework that governs appeals concerning jury instructions. In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues

supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

[13,14] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024). It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given. *Id.*

(a) Jury Instruction No. 3

Mielak argues that the district court erred in instructing the jury on the elements of first degree sexual assault in jury instruction No. 3. Specifically, Mielak objects to the language taken from § 28-319(1)(b) that states the jury could convict Mielak if the State proved beyond a reasonable doubt that Mielak knew or should have known that H.S. was mentally or physically incapable of resisting or appraising the nature of his conduct. Mielak asserts that the court should have provided the jury with language explaining that to convict Mielak under the "should have known" theory of § 28-319(1)(b), the jury had to find that Mielak committed criminal negligence. He asserts that this was necessary to communicate to the jury the sufficient mens rea element that due process requires for a felony conviction.

During the formal jury instruction conference, the district court and the parties discussed a prior drafted instruction defining criminal negligence. It is not clear whether this instruction was included in the court's first proposed instructions or whether Mielak submitted it. In any event, the court ultimately declined to provide this proposed instruction to the jury, finding that its language was pulled from an unrelated statute and that the statutory language of § 28-319(1)(b) was sufficient to instruct the jury as to the elements of the offense.

[15] To the extent that Mielak argues that the court erred in excluding this specific proposed instruction, we do not consider this argument because Mielak did not include the proposed instruction in the record on appeal. Appellants are required to show that their tendered instruction was a correct statement of law and that it was warranted by the evidence. See *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015). To do so, appellants need to include their proposed instruction in the record on appeal. *Id.* As we have no instruction to review, we cannot determine whether it should have been given to the jury.

[16,17] To the extent that Mielak more generally argues that the language used in jury instruction No. 3 was insufficient and prejudicial, we disagree. In giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Although the law does not require that a jury instruction track the exact language of the statute, using the specific language of a statute is an effective means of implementing the intent of the Legislature. *Id.* In this case, jury instruction No. 3 utilized the plain language of § 28-319(1)(a) and (b) to describe the offense of first degree sexual assault. It is a correct statement of law and fully sets out the elements of the offense as set forth by the Legislature. Accordingly, we conclude that jury instruction No. 3 was not prejudicial and did not otherwise adversely affect Mielak's substantial rights. We reject this assignment of error.

### (b) Response to Jury Questions

Mielak argues that the court erred when it declined to provide the jury with his proposed instructions to its two questions concerning the word "conduct." The State disagrees and counters that Mielak's proposed instructions contradicted the plain and ordinary meaning of the word "conduct." The State also asserts that the proposed instructions were not correct statements of law.

The first question asked for a definition of the word "conduct" as it was used within the statutory definition of the phrase "without consent." Mielak's proposed instruction defines conduct as an affirmative act and states that inaction is not conduct. The second question asked whether action prior to an incident could be considered conduct. Mielak's second proposed instruction states that the conduct expressing a lack of consent must be directed toward the sexual conduct that is the subject of the charge.

As stated earlier in this opinion, the statute does not define the word "conduct." However, what constitutes "conduct" in any given case is determined in light of the description provided in § 28-318(8)(b). The jury was provided this description in jury instruction No. 5. That instruction states in part that the definition of "without consent" includes the expression of a lack of consent through the conduct of the victim. It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024). Mielak's proposed instructions sought to expand upon the definition of "conduct," but § 28-318(8)(b) largely addresses the substance of this issue by stating that the victim need only resist, either verbally or physically, so as to make his or her refusal to consent genuine and real and to reasonably make known the refusal. The instructions given adequately advised the jury that to convict Mielak under the State's "without consent" theory, the law required H.S. to engage in conduct sufficient to make her refusal to consent genuine and reasonably known.

Mielak's proposed instructions attempt to narrow the plain and ordinary definition of the term, add requirements and language not found in the statute, and limit the jury's consideration of all the facts and circumstances. Mielak has not provided us with any authority that supports his proposed definitions or instructions. Mielak has thus not met his burden

to show that his tendered instructions are correct statements of law. Without such proof, we cannot find reversible error.

[18,19] The district court's instruction stated that the jury possessed the necessary evidence and instructions applicable to the case. This allowed the jurors to determine that H.S.' conduct was based on the statutory language provided by the Legislature and their own common understanding of the word. Jurors are accepted because they are men and women of common sense and have a common understanding of words ordinarily used in our language. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). In instructing a jury, the trial court is not required to define language commonly used and generally understood. *Id.*

While we acknowledge that the jury inquired about the definition of the word "conduct," we find no error in the district court's determination that the juror's common understanding of the word, paired with the instructions already given, was adequate. The word "conduct" is an ordinary term well within the understanding, common sense, and usage of the average juror. The Legislature's decision not to define the term suggests that the ordinary definition was intended. This is particularly true considering that the statutory scheme includes a defined terms list.

For all these reasons, we find no error in the district court's refusal to give Mielak's tendered responses to the jury's questions. This assignment of error is without merit.

## VI. CONCLUSION

We conclude that there was sufficient evidence to support Mielak's conviction for first degree sexual assault and that the district court did not err in determining what jury instructions or supplemental jury instructions should be given. We affirm Mielak's conviction.

Affirmed.