IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

BELINA V. BELINA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WHITNEY BELINA, APPELLEE,

V.

TRAVIS BELINA, APPELLANT.

Filed April 15, 2025.    No. A-24-650.

Appeal from the District Court for Madison County: MARK A. JOHNSON, Judge. Affirmed in part, and in part vacated.

Eric M. Hagen, of Liberty Law Group, for appellant.

Timothy P. Matas, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

The district court for Madison County granted Whitney Belina an ex parte domestic abuse protection order against her husband, Travis Belina, for herself and her four minor children. After a show cause hearing, the district court affirmed the domestic abuse protection order for Whitney and the children.

Travis now appeals that order. For the reasons that follow, we affirm, in part, and in part reverse.

## BACKGROUND

Whitney and Travis have known each other for 7 years. They were married in 2018 and have four children together, two girls and two boys. At some point around 2020, they started a business running a feedlot.

On May 8, 2023, Travis was charged with 10 criminal counts related to the sexual assault of multiple female teenagers working for the feedlot. After a trial was held in April 2024, Travis was found guilty on eight of the charges and eventually sentenced to 11½ years' imprisonment and 6 years' post-release supervision. He was also placed on the Nebraska Sex Offender Registry. During those proceedings, Travis was able to post bond and, as of the time of this appeal, remained out of prison on an appeal bond.

On July 11, 2024, Whitney filed a petition to obtain a domestic abuse protection order for herself and her four children. In this petition, she stated that she wanted a protection order because Travis' temper and actions made her feel unsafe. She provided allegations of several undated events where Travis had followed her around their house, shown up at her gym, and inserted his fingers into her vagina while she slept.

Whitney's petition also cited two incidents that occurred on July 5 and 11, 2024. For the July 5 incident, she alleged that Travis got very angry after she told him that she was going to change the children's last names and that he needed to find another place to live. Whitney provided that she was prompted to do this after seeing their address listed on the sex offender registry. She alleged that after hearing this, Travis stared at her for "5-10 seconds with a terrifying look that made [her] scared for [her] safety."

For the July 11, 2024, incident, Whitney alleged that Travis came to her house upset because he was not able to see their children. Whitney told him that she had been raising the children alone for almost 4 years and that he could not suddenly start being a father again. She alleged that this made Travis angrier. Later that day, while Whitney was filing for the protection order, she alleged that Travis came back to the house and tried to take two of their children. While he did not ultimately take them, Whitney stated that this made her very upset and scared.

On July 11, 2024, the district court issued an ex parte domestic abuse protection order enjoining Travis from having contact with Whitney and the children. On July 15, Travis filed a request for a hearing, which was held on August 2. At the hearing, Whitney called Keri Dreger and Maci Pollard as witnesses and testified on her own behalf. Travis' only witness was his mother, Kim Belina.

Whitney generally testified about her relationship with Travis and how she stood by him throughout the sexual assaults trial. She stated that she believed he was innocent at that time, but that changed after he was found guilty. Nevertheless, she explained how she wrote a letter for his presentence investigation report defending his character. She said Travis and his family pressured her to write this letter and that she wrote it to prevent Travis from getting angry. Since then, her opinion of Travis has changed and she has filed for divorce.

Whitney then discussed the allegations in her petition and other times Travis lost his temper. She explained that sometime around 2020 or 2021 she made a mistake on an employee's check and corrected it. But after telling Travis about the error, he got very angry, emptied her closet, and threw her clothes all over their bedroom. She next described an incident that occurred on June 29, 2021, when Travis was drunk and wanted to have sex, but she declined. She stated that he got very upset, tried kicking her, and squeezed her arms. Once she was able to get on her feet, he grabbed her collarbone and attempted to pull her back, but she broke free and ran to the bathroom. As a result of this incident, she sustained bruises on her arm and collarbone.

Another incident occurred in early 2024. In this occasion, Whitney was sitting in her vehicle in front of her gym when Travis pulled up. She stated that she did not tell him where she was and did not expect him to be there. A similar event happened on March 17, 2024, when Travis showed up unannounced at a hotel Whitney was staying at. Whitney said she did not tell him where she was and did not know how he found her. She explained that Travis makes her feel unsafe when he shows up at locations like that. She described it as feeling like she is never alone.

Whitney next described an incident from April 2024 that occurred around the time of Travis' trial. She explained how they were talking about their finances when she indicated that it was possible he could be found guilty. Upon hearing that, Travis got very upset, ripped a phone charger out of the outlet, walked away, and told Whitney, "Fuck you."

Whitney then discussed the incident where she woke up with Travis' fingers in her vagina. She stated that on June 13, 2024, she went to bed before Travis got home. Earlier in the day, Travis asked her if he could wake her up when he returned, but Whitney told him no. However, while she was sleeping, Whitney felt something touch her butt, move to her inner thigh, and once she woke up, she realized Travis' fingers were in her vagina. Once she realized what was happening, she asked him "What the "F" [he was] doing." Travis responded that he needed sex and that they needed it as a couple. Whitney explained that because she did not want to argue with him, she ignored his comments and went back to sleep.

Whitney next described another incident that happened the week of June 13, 2024. She stated that she was talking with Travis and laughing at something he was doing when he started tickling her. She said she continued to laugh because he was tickling her, but wanted to cry because she did not want him touching her. After she told him to stop, he continued and eventually touched her butt and vagina. At that point, Whitney got upset and told him to stop. Travis then threw his hands back in a joking manner and asked her, "[I]s that sex assault." Whitney said at that point she thought he might have committed the other sexual assaults because he thought sexual assaults were funny.

Whitney then spoke about July 14, 2024, the day she filed the petition for the domestic abuse protection order. On that day, someone sent her a screenshot of Travis' sex offender registration that listed their home address and vehicle. She said this made her uncomfortable because she did not feel like her children were safe in the home. Because of these feelings, she told Travis he needed to move out and that she was going to change the children's last names. Travis then stared at her for 5 to 10 seconds with a look that scared her. However, Travis left the house that night and moved in with his mother.

Whitney also talked about how Travis threatened to kill himself if he was found guilty and went back to prison. After being convicted, Travis spent 4 days incarcerated before posting an appeal bond. Whitney said that when he returned, he said that if he had to go back, he would just "end it" and "put a bullet in [his] head and be done." She explained that Travis' temper worsened after being convicted and that his threats of suicide made her fear for her and her children's safety.

Lastly, Whitney discussed concerns she had about Travis being around their children. While she stated that she had never seen Travis threaten or strike any of their children, she had received information from her 5-year-old daughter that concerned her. She did not specify what this information was, but around this time, she also noticed that her daughter was more ambivalent toward Travis and would "push him off" when he tried to hug her. With this, and the testimony

she heard during Travis' trial, Whitney did not feel comfortable with him being around their children.

Dreger works for the same company as Whitney and lives next door to her. She stated that she has formed a bond with Whitney since becoming her neighbor in June 2024. Dreger said that Whitney told her about the incident where Travis penetrated her while she was asleep. She explained that Whitney "broke down" while telling her about it and could not stop crying. She also spoke about witnessing Travis follow Whitney around their house on multiple occasions. She described how Travis followed her from room-to-room, and sometimes outside, although Whitney would be telling him that she needed space.

Since becoming their neighbor, Dreger also formed a relationship with Travis. She stated that she spoke with him multiple times where he expressed a desire to kill himself if he lost his wife and children or went back to prison. She also discussed how she saw Travis' truck drive by her and Whitney's work place on several occasions. But she testified that she had never seen Travis threaten any of the children.

Pollard is Dreger's daughter who babysits for Whitney. She described what occurred on July 11, 2024, when Whitney went to file the petition for the protection order. Pollard explained that she was watching Whitney's children at a park while Whitney went to the courthouse. However, the children soon got hungry so Pollard took them to Whitney's house. After pulling into the garage, Pollard noticed that Travis and his mother had pulled in behind them. The two boys ran up to Travis and asked if they could go with him. Travis asked Pollard if that was okay, so she called Whitney, who said they could not go with Travis. After a couple of minutes, Travis said good-bye to the children and left.

Kim is Travis' mother. She explained that Travis and Whitney's marriage had typical problems but was generally pretty good. She said that Travis had strong relationships with his children and that they were always excited to see him. She stated that she never witnessed any issues between him and his children and that he was making great efforts to spend time with them despite his problems.

Kim next explained her side of the July 11, 2024, incident when she and Travis showed up at Whitney's house. She said that Travis went there to see if Whitney could take him to pick up his truck, and that he did not have any intention to take the children without her permission. She then discussed Travis and Whitney's oldest daughter's behaviors. Kim thought the change in her behavior toward Travis was due to her being very close to Whitney and not wanting to see her upset. She said that whenever Whitney is upset, the oldest daughter's attitude changes to mirror Whitney's.

After closing arguments, the district court made several findings of fact. It found that a sexual assault occurred without Whitney's consent, Whitney had suffered bruising from an incident between the parties, and that Whitney was grabbed in an intimate area without consent. As to the last finding, the court was concerned about Travis' comment "[I]s that sex assault" and noted that it illustrated his lack of respect for other people's boundaries. The court then observed that those actions, Travis' threats of suicide, and his other erratic behaviors constituted threatening behavior against Whitney and the four children. With this, the court sustained Whitney's petition for the domestic abuse protection order as to herself and the children.

Travis now appeals.

ASSIGNMENTS OF ERROR

Restated, Travis assigns the district court erred in affirming the ex parte domestic abuse protection order for Whitney and the four children.

STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the district judge heard and observed the witnesses and accepted one version of the facts rather than another. *Rachel C. on behalf of Clayton R. v. Amos R.*, 32 Neb. App. 473, 1 N.W.3d 528 (2023).

ANALYSIS

Travis generally argues the district court erred in affirming the ex parte domestic abuse protection order because neither Whitney nor the children were ever victims of domestic abuse.

A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Diedra T. v. Justina R., supra*. As such, the petitioner at a show cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Id.* Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. *Id.*

Domestic abuse protection orders are governed by Neb. Rev. Stat. § 42-924 et seq. (Supp. 2023). Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by Neb. Rev. Stat. § 42-903 (Supp. 2023), a protection order may not remain in effect. See, § 42-903; § 42-924; Neb. Rev. Stat. § 42-925 (Cum. Supp. 2022); *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018). Section 42-903 defines "abuse" in pertinent part as follows:

> (a) Attempting to cause or intentionally and knowingly causing bodily injury[;]
> (b) Placing, by means of credible threat, another person in fear of bodily injury[;] or
> (c) Engaging in sexual contact or sexual penetration without consent as defined in [Neb. Rev. Stat. § 28-318 (Supp. 2024)].

Section 28-318(5) defines "Sexual contact" as:
> [T]he intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. . . . Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

Section 28-318(6) next defines "Sexual penetration" as:
> [S]exual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object

manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen[.]

And § 28-318(8)(a) defines "Without consent" as:

(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or

(ii) the victim expressed a lack of consent through words, or

(iii) the victim expressed a lack of consent through conduct. . . .

As it relates to Whitney, we determine the district court did not err in affirming the ex parte domestic abuse protection order because Travis abused Whitney by engaging in sexual contact and penetration without her consent.

In *State v. Mielak*, 33 Neb. App. 309, 16 N.W.3d 143 (2025), we stated that the inquiry to determine if a person engaged in sexual contact or penetration without consent under § 28-318(8)(a) is dependent on whether a reasonable person would have known the victim's words and conduct were a "genuine and real" refusal of consent. We also held that the term "conduct" as used in § 28-318(8)(a)(iii) "is not limited solely to active expression." *State v. Mielak*, 33 Neb. App. at 325, 16 N.W.3d at 157. With this, we acknowledged that in certain circumstances "inaction could be a component of an individual's conduct." *Id.* In that case, we ultimately determined there was sufficient evidence to find the perpetrator acted without the victim's consent, as a result of her conduct, because he had been given two clear instructions not to enter the victim's room and the victim was asleep when he penetrated her. *Id.* Specifically, we stated "there was no reason for [the defendant] to believe that [the victim] was willing to engage in sexual contact with him, especially when she was asleep on the bathroom floor." *Id.* at 325, 16 N.W.3d at 157.

Similarly, in the present matter, there was no reason for Travis to believe that Whitney consented to sexual activity with him the night of June 13, 2024. First, Whitney had previously directed him to not wake her up when he got home from work. This direction expressed a clear desire to not be bothered, let alone sexually penetrated. And second, Whitney was asleep when she was digitally penetrated. In this circumstance, Whitney's direction to not wake her up and inaction constituted conduct that a reasonable person should have realized was a genuine and real refusal of consent. See *State v. Mielak, supra.* For these reasons, we determine Travis' conduct constitutes sexual penetration without consent. See, § 28-318(6); § 28-318(8)(a)(iii). As such, his conduct meets § 42-903(1)(c)'s definition of abuse.

We also determine Travis' conduct later that same week where he touched Whitney's butt and vagina while tickling her constituted sexual contact without consent under § 28-318(5) and § 28-318(8)(a)(ii). Whitney testified that Travis did not stop tickling her when she told him to stop but instead touched her butt and vagina over her clothes. After Whitney told him to stop more forcibly, he responded with "[I]s that sex assault." We determine this evidence is sufficient to determine that Travis intentionally touched the clothing covering Whitney's intimate parts for the purpose of sexual arousal or gratification after she expressed a lack of consent through words. § 28-318(5); § 28-318(8)(a)(ii). Accordingly, this conduct also meets § 42-903(1)(c)'s definition of abuse. Because Travis abused Whitney by engaging in sexual contact and penetration without

her consent, we determine the district court did not err in affirming the ex parte domestic abuse protection order as it relates to Whitney.

We do not decide whether Travis' other behaviors, such as bruising Whitney's arm and collarbone in June 2021 and showing up unannounced at various locations also qualify as abuse against Whitney under § 42-903(1). An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Ronnfeldt Farms, Inc. v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024). Given our determination that Travis' sexual contact and penetration of Whitney, without her consent, justified the district court affirming the protection order, we do not evaluate whether Travis' other actions and behaviors toward Whitney constituted abuse.

As it concerns the four minor children, we determine the district court erred in affirming the ex parte domestic abuse protection order. Although Whitney argues that Travis' threats of suicide constituted "credible threats" that placed "another person in fear of bodily injury" under § 42-903(1)(b), we disagree. That section defines "credible threat" as:

> [A] verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the person making the threat had the intent to actually carry out the threat.

The Nebraska Supreme Court has held that § 42-903's "credible threat" language requires the evidence at trial include some threat of intentional physical injury or any other physical threat. See *Linda N. on behalf of Rebecca N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

Whitney argues that Travis' threats of suicide constitute credible threats against the children because they could be harmed by potentially witnessing the act, or by whatever mechanism Travis may use to end his own life. But to constitute abuse under § 42-903(1)(b), the credible threat must intentionally threaten "another person" with bodily injury. § 42-903(1)(b); *Linda N. on behalf of Rebecca N. v. William N., supra.* In this regard, threats of suicide do not meet § 42-903(1)(b)'s definition of abuse by means of a credible threat.

There was also no evidence that Travis ever threatened the children, let alone threatened them with intentional physical harm. In contrast, the evidence reflects the opposite. Whitney, Dreger, and Kim all testified that they had never seen Travis harm or threaten any of the children. Without any evidence that Travis specifically threatened any of the children with intentional injury, his actions cannot constitute credible threats against them. Because there was no evidence that Travis attempted to or caused bodily injury, made credible threats against, or engaged in sexual contact or penetration with the children, they do not qualify as victims of domestic abuse under § 42-903(1).

While we observe that Whitney indicated some concern regarding Travis' relationship with their eldest daughter, she never made any specific allegations or outlined the bases for those concerns in greater detail. Therefore, we cannot determine that Travis abused her under § 42-903(1). Further, because the record generally lacks any evidence concerning the ill treatment

of the children by Travis, they also do not qualify for other types of protection orders under our de novo review. See Neb. Rev. Stat. § 28-311.02(2) (Reissue 2016). Accordingly, we vacate the domestic abuse protection order as it relates to the four minor children.

## CONCLUSION

We determine the district court did not err in affirming the ex parte domestic abuse protection order as it relates to Whitney but erred in affirming the protection order as it relates to the four children.

AFFIRMED IN PART, AND IN PART VACATED.